[Civ. No. 33613. First Dist., Div. One. Feb. 4, 1974.]

HERBERT D. VAN VOORHIS, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD and
BETHLEHEM STEEL CORPORATION, Respondents.

**COUNSEL**

Charles P. Scully and Kathryn E. Ringgold for Petitioner.

Byhower, Longley & Petherbridge and C. M. Langley as Amici Curiae on behalf of Petitioner.

Hanna, Brophy, MacLean, McAleer & Jensen and Albert Sennett for Respondents.

**OPINION**

**SIMS, Acting P. J.**—By his petition for writ of review, the petitioner, an applicant for permanent disability benefits, following denial of his petition for reconsideration, seeks review of an award made by respondent board in an opinion and order granting reconsideration to respondent employer

and its decision after reconsideration. Applicant claims benefits for a hearing loss allegedly suffered during employment for a period commencing in 1937, and terminating with his retirement October 31, 1963, but only discovered to be industrially related on September 7, 1971. He contends that the board erred in computing annual earnings for permanent disability indemnity on the basis of "the date of injury" for purposes of the statute of limitations as set forth in section 5412 of the Labor Code,[1] rather than on the basis of "the time of the injury" as prescribed by section 4453.[2] The

---

[1]Labor Code section 5412 provides: "The date of injury in cases of occupational diseases is that date upon which the employee first suffered disability therefrom and either knew, or in the exercise of reasonable diligence should have known, that said disability was caused by his present or prior employment." This section is found in part four of the law dealing with workmen's compensation and insurance, under the title "Compensation Proceedings," and under the chapter (§§ 5400-5412) heading "Limitation of Proceedings." The phrase "date of injury" is found in section 5405 which provides in part, "The period within which may be commenced proceedings for the collection of the benefits provided by . . . this division is one year from: [¶] (a) The date of injury; or . . ."

Labor Code section 6 reads: "Division, part, chapter, article, and section headings contained herein shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning, or intent of the provisions of any division, part, chapter, article, or section hereof." Nevertheless, section 5 admonishes, *"Unless the context otherwise requires, the general provisions hereinafter set forth shall govern the construction of this code."* (Italics added.) Therefore, even though the headings be disregarded, the context in which a section is found must be considered in determining its scope, meaning and intent.

[2]Labor Code section 4453 provided in 1963: "In computing average annual earnings for the purposes of temporary disability indemnity only, the average weekly earnings shall be taken at not less than thirty-eight dollars and forty-six cents ($38.46) nor more than one hundred seven dollars and sixty-nine cents ($107.69). In computing average annual earnings for purposes of permanent disability indemnity, the average weekly earnings shall be taken at not less than thirty dollars and seventy-seven cents ($30.77) nor more than eighty dollars and seventy-seven cents ($80.77). Between these limits the average weekly earnings, except as provided in Sections 4456 to 4459, shall be arrived at as follows:

"(a) Where the employment is for 30 or more hours a week and for five or more working days a week, the average weekly earnings shall be 95 percent of the number of working days a week times the daily earnings at the time of the injury.

"(b) Where the employee is working for two or more employers at or about the time of the injury, the average weekly earnings shall be taken as 95 percent of the aggregate of such earnings from all employments computed in terms of one week; but the earnings from employments other than the employment in which the injury occurred shall not be taken at a higher rate than the hourly rate paid at the time of the injury.

"(c) If the earnings are at an irregular rate, such as piecework, or on a commission basis, or are specified to be by the week, month or other period, then the average weekly earnings mentioned in subdivision (a) above shall be taken as 95 percent of the actual weekly earnings averaged for such period of time, not exceeding one year, as may conveniently be taken to determine an average weekly rate of pay.

"(d) Where the employment is for less than 30 hours per week, or where for any

effect of the board's decision was to reduce applicant's award from $7,560, 36 percent permanent disability predicated upon maximum earnings as of October 31, 1963, to $2,880 for the same disability as predicated upon minimum earnings as of September 7, 1971. A writ of review having issued,[3] and return having made, and the matter having been regularly submitted, it is concluded that the board erred. Its decision and award must therefore be vacated, and the matter returned for reinstatement of the award granted by the referee.

Applicant, who was born January 26, 1902, was employed by respondent employer from 1937 through October 31, 1963, when he retired. He was employed as a rigger-leaderman-supervisor, and until the last four years of his employment when his duties were clerical he was exposed to intermittent noise. At the time of his retirement his compensation was such as to entitle him to compensation for permanent disability at the maximum rates. According to the facts alleged in the employer's petition for reconsideration, applicant first became aware of his hearing trouble during the

reason the foregoing methods of arriving at the average weekly earnings cannot reasonably and fairly be applied, the average weekly earnings shall be taken at 95 percent of the sum which reasonably represents the average weekly earning capacity of the injured employee at the time of his injury, due consideration being given to his actual earnings from all sources and employments." (Stats. 1961, ch. 1621, § 2, p. 3515.) Subsequent amendments affected the minimum and maximum average weekly earnings operative as of January 1, 1969 [Stats. First Ex. Sess. 1968, ch. 4, § 4, p. 31] and April 1, 1972 [Stats. 1971, ch. 1750, § 7, p. 3778]. This section is found in that part of the law entitled "Computation of Compensation" under the chapter (§§ 4451-4460) heading "Average Earnings." These earnings are a factor in determining the amount of the disability payments for permanent disability under the provisions of sections 4658 and 4659.

[3]Following the referee's award, the employer filed a petition for reconsideration in which it contended (1) that applicant's claim was barred by the statute of limitations; (2) that his earning capacity was such that he was not entitled to compensation at a rate in excess of the minimum rate; (3) that because he had retired following the last date of exposure it was error to conclude that his injury had caused permanent disability; and (4) that the permanent disability rating did not take into sufficient account the extent to which applicant's hearing loss was attributable to the aging process. The board ruled in favor of the applicant on all but the second point. It concluded that the time of injury was the date of the discovery that the disability was industrially caused, September 7, 1971, and that, as was the fact, applicant's earnings were minimal at that time. It added, "Even if the referee is right in stating that applicant's earnings should be determined as they existed in·1963, which the Board does not concede, there may well be merit in defendant's argument that the rationale behind the Court's decision in *Goytia* v. *WCAB,* 37 CCC 104 [(1972) 6 Cal.3d 660] would still require a finding of minimum earning capacity." Because of what now appears to be but a superficial resemblance to *Goytia* and *Dickow* v. *Workmen's Comp. Appeals Bd.* (1973) 34 Cal.App.3d 762 [109 Cal.Rptr. 317] (see text part II below), this court denied a writ of review without opinion. Thereafter, the Supreme Court granted a hearing and returned the case to this court with instructions to issue a writ of review.

Second World War, and complained to his employer's doctor. He was sent to another doctor who examined his hearing, and from 1951 to 1964 he wore a hearing aid on an intermittent basis. He was also told to wear ear protectors. He followed this advice while working in his employer's yard. According to the testimony of the applicant, which was accepted by the referee and the board, the doctor told him that his hearing difficulties had nothing to do with his work, but were the result of something that occurred in his childhood.

Applicant's retirement on October 31, 1963, at the age of 61, was motivated by and warranted by the fact that the applicant suffered pain in his back and legs. No mention was made of his hearing loss, and he never lost any time or wages, or received medical treatment for that complaint. Following his retirement, applicant's sole work was on a self-employed basis, raising worms for fishermen, and he intentionally restricted his earnings to $1,000 a year to avoid loss of social security benefits.

In September 1971, he was told that his hearing loss might have been due to his employment. On September 7, 1971, he was examined by a doctor who so concluded, and on September 15, 1971, he filed the application which gave rise to these proceedings. On February 28, 1973, the referee filed an award granting applicant 36 percent disability at the maximum rate of compensation, based upon his earning capacity as of October 31, 1963, together with costs, which are not disputed. On the employer's petition for reconsideration, reconsideration was granted and the award was modified on the basis of the minimum earnings of the applicant as of September 7, 1971.

## I

The board indicated that applicant's hearing loss was an occupational disease. (See *Fruehauf Corp.* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 569, 578, fn. 8 [68 Cal.Rptr. 164, 440 P.2d 236]; *Argonaut Insurance Company* v. *I.A.C.* (1964) 29 Cal. Comp. Cases 390; *Kaiser Steel Corporation* v. *I.A.C.* (1963) 28 Cal. Comp. Cases 175; *Messner* v. *Industrial Acc. Com.* (1963) 216 Cal.App.2d 536 [30 Cal.Rptr. 898, 27 Cal. Comp. Cases 226]; *Halyaman* v. *California Casualty Indemnity Exchange* (1959) 24 Cal. Comp. Cases 232.) It noted that as such, and that even if the injury were deemed a cumulative injury within the provisions of section 3208.1,[4] a claim for the resulting disability would not be barred under

---

[4]Section 3208.1 (as added effective Jan. 1, 1969) provides: "An injury may be either: (a) 'specific,' occurring as the result of one incident or exposure which causes disability or need for medical treatment; or (b) 'cumulative,' occurring as repetitive

the provisions of section 5412 (fn. 1 above) until the employee either knew, or in the exercise of reasonable diligence should have known that the disability was related to his employment. (See *Fruehauf Corp.* v. *Workmen's Comp. App. Bd., supra,* 68 Cal.2d 569, 577; *Hanna* v. *Workmen's Comp. Appeals Bd.* (1973) 32 Cal.App.3d 719, 723 [108 Cal.Rptr. 227]; and *Chavez* v. *Workmen's Comp. Appeals Bd.* (1973) 31 Cal.App.3d 5, 12-13 [106 Cal.Rptr. 853].)

It then went on to conclude that since "the date of injury" (§ 5412) for determining the period within which a proceeding for the collection of benefits could be commenced (§ 5405) was September 7, 1971 (§ 5412), that date was the proper date to serve as a proper reference for computing the applicant's annual earnings for the purpose of permanent disability indemnity (§ 4453, see fn. 2 above). Since applicant was not regularly employed at that time the board relied upon principles found in *Argonaut Ins. Co.* v. *Industrial Acc. Com.* [*Montana*] (1962) 57 Cal.2d 589 [21 Cal.Rptr. 545, 371 P.2d 281] (see part II below) and found that the applicant's earnings were minimal.

█  In support of the board's conclusion that the applicable date for computing the applicant's earnings was the date that he discovered that his disability was caused by his prior employment, the employer relies upon *Argonaut Mining Co.* v. *Ind. Acc. Com.* [*Gonzalez*] (1951) 104 Cal.App.2d 27 [230 P.2d 637]. In that case the court noted that section 5412, which refers to "date of injury" appears in the chapter of the Labor Code entitled "Limitation of Proceedings" (see fn. 1 above), and then stated: "This would seem to lend support to petitioner's contention that section 5412 of the Labor Code deals with the date of injury in cases of occupational diseases only for the purpose of computing the statute of limitations in such cases." (104 Cal.App.2d at p. 31.) The court did not assail the logic of that position, but went on to examine other facets of the case which were deemed controlling. It stated, "But respondent commission's position is just as logical. Regardless of the date of exposure to disease, the claimant has no cause of action and no rights accrue to him until *that point in time when the cumulative effects of his disease result in a compensable disability*. It would seem that the law then in effect should govern the claimant's rights.

"It would seem logical that even if the *Marsh* case [*Marsh* v. *Industrial*

mentally or physically traumatic activities extending over a period of time, the combined effect of which causes any disability or need for medical treatment; provided, however, that the date of cumulative injury shall be the date of disability caused thereby."

*Acc. Com.* (1933) 217 Cal. 338 (18 P.2d 933, 86 A.L.R. 563)] and the subsequent changes in the code section are held to set the 'date of injury' in cases of occupational disease only for the purpose of relieving a sufferer from occupational disease from the operation of the statutes of limitation, a necessary corollary would be that it also sets the date for the measurement of compensation payable, and all other incidents of the workman's right. Until the disability there is no compensable injury. When the disease results in disability there then comes into existence for the first time a right in the petitioner to seek compensation. When the right comes into existence certain rates are applicable. It would seem that there are the rates by which compensation should be payable." (*Id.,* italics added. See also *Dickow* v. *Workmen's Comp. Appeals Bd.* (1973) 34 Cal.App.3d 762, 764-765 [109 Cal.Rptr. 317]; and *Johns-Mansville Products Corp.* v. *Industrial Acc. Com.* (1965) 30 Cal. Comp. Cases 240 [writ den.].)

It is obvious that in the quoted case the court was concerned with a claim for disability for an occupational disease which did not result in disability until some years after the period of exposure. The facts show that the employee was exposed to silica during the period 1923 through 1928, but that he suffered no disability until 1948. The court, therefore, properly found that the "time of injury" and as well the "date of injury" was the date when the injury resulted in "compensable disability." The same principle was applied in the other cases cited above. (Cf. *Dow Chemical Co.* v. *Workmen's Comp. App. Bd.* (1967) 67 Cal.2d 483, 493 [62 Cal.Rptr. 757, 432 P.2d 365]; and *Beveridge* v. *Industrial Acc. Com.* (1959) 175 Cal.App.2d 592, 594-598 [346 P.2d 545].)

Here both the referee and the board found that the applicant suffered his compensable disability in the form of a hearing loss prior to his retirement in 1963. One of the issues resolved by the board in applicant's favor was whether the referee had properly apportioned applicant's hearing loss between that which was industrially caused and which existed in 1963, and that which eight years later could be attributed to his aging process. The board concluded, "In the opinion of the Board the method which the referee chose is a reasonable one and has resulted in defendant being charged only with the hearing loss properly attributable to applicant's employment exposure."

In this case, therefore, the compensation must be measured by the applicant's earning capacity as it existed at the time he incurred his compensable disability (§ 4453). Section 5412 only serves to permit him to assert a claim for an occupational disease (or cumulative injury [§ 3208.1]) which eight or more years previously resulted in a compensable disability, be-

cause he did not know and in the exercise of reasonable diligence could not have known it was caused by his employment. Once the compensable disability occurs, the substantive rights of the employee or those claiming under him for that disability cannot be reduced or enhanced. (See *Smith* v. *Bd. of Admin. Retirement System* (1957) 152 Cal.App.2d 691, 696 [313 P.2d 617].)

## II

Since the disability existed at or before the time of the retirement and the employment was apparently for 30 or more hours a week, and for five or more working days a week, the average annual earnings for purposes of permanent disability indemnity were to be computed as provided in subdivision (a) of section 4453, unless as so computed they were less than, or, as found by the referee, greater than the amounts prescribed in the body of the section. The board, however, suggested that even if the applicant's earnings should be determined as they existed in 1963, there may well be merit in the employer's argument that the decision in *Goytia* v. *Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 660 [100 Cal.Rptr. 136, 493 P.2d 864, 37 Cal. Comp. Cases 104], would still require a finding of minimum earning capacity.

The employer does not go so far as to state that *Goytia* is controlling. He merely states that it furnishes "strong support" for the contention that the applicant's earnings would be minimal even if the "time of injury" were deemed to be contemporaneous with his retirement because it was the last time of possible exposure.[5] The contention is based on the admitted fact that thereafter applicant for personal reasons did in fact withdraw from the labor market. In *Goytia* the converse was true, the applicant, although but a minimal wage earner, erroneously had been precluded from showing that she could enter a higher paying labor market because of her admitted industrial disability. The distinction is that in *Goytia* the issue arose under subdivision (d) of section 4453 in an attempt to determine "the sum which reasonably represents the average weekly earning capacity of the injured employee at the time of his injury, due consideration being given to his actual earnings from all sources and employments."

In this case there was only reason to pursue that formula if "the time of the injury"—the time of the origin of the right to compensable disability whether known, or unknown, and so tolled in enforcement—was in 1971.

---

[5]The last date of exposure may well have been four years prior to retirement when the employee transferred to clerical duties.

Since at and before his retirement when the injury occurred and the disability was actually suffered the defendant was regularly employed there was no need to resort to the foregoing formula because the matter was governed by subdivision (a) of section 4453.

In *Argonaut Ins. Co.* v. *Industrial Acc. Com.* [*Montana*], *supra,* the court stated: "An estimate of earning capacity is a prediction of what an employee's earnings would have been had he not been injured. Earning capacity, for the purposes of a temporary award, however, may differ from earning capacity for the purposes of a permanent award. In the former case the prediction of earnings need only be made for the duration of the temporary disability. In the latter the prediction is more complex because the compensation is for loss of earning power over a long span of time." (57 Cal.2d at p. 594.) In the same opinion, the court also approved the criteria for computing average earnings for permanent disability purposes set forth in *West* v. *Industrial Acc. Com.* (1947) 79 Cal.App.2d 711 [180 P.2d 972], as follows: "The applicant's ability to work, his age and health, his willingness and opportunities to work, his skill and education, the general condition of the labor market, and employment opportunities for persons similarly situated are all relevant." (*Id.,* at p. 595. See 79 Cal.App.2d at p. 722.) In neither of these cases was the court concerned with an applicant who was regularly employed at the time he suffered a compensable disability. Each recognizes "When an employee is steadily employed at a full-time job his earning capacity is determined by an appropriate formula . . ." (57 Cal.2d at p. 594), and ". . . earning capacity at the time of injury is the touchstone of average earnings in California." (79 Cal.App.2d at p. 722.) Whatever effect those cases might have had with respect to an injury suffered in 1971 when the applicant was not so employed, is not controlling or even persuasive with respect to a disability which existed at and before the time the employee retired. The evidence of the retired employee's unwillingness to engage in but limited compensable employment, does not demonstrate the reasonableness of the determination made with respect to his average annual earnings at the actual time of his injury. (See *Argonaut Ins. Co.* v. *Industrial Acc. Com., supra,* 57 Cal.2d 589, 595; and cf. *Aetna Life Ins. Co.* v. *Indus. Acc. Com.* (1933) 130 Cal.App. 488, 496 [20 P.2d 372].)

The referee whose report and recommendation on petition for reconsideration was quoted with approval by the board, ably disposed of this contention in refuting the employer's argument that since the applicant

was retired and not in the labor market at the "artificial" date of injury (1971), he was not entitled to any award because there was no need to rehabilitate him. The referee stated, "Although encouragement of rehabilitation is one of the purposes of a permanent disability award, it is not the only purpose. The permanent disability award constitutes a substitute remedy for the remedy which was lost when the Legislature took away the right to sue an employer for damages. If an applicant were denied a permanent disability award simply because he has retired, he would be deprived of his quid pro quo in that legislative bargain. The permanent disability award also provides a financial incentive to the employer to provide safe working conditions (in the context of this case, to insist on the wearing of adequate ear protectors) so that injuries causing permanent disability will not occur (the Workmen's Compensation Act was originally entitled 'The Workmen's Compensation and Safety Act'). The award is also a means of implementing the social cost accounting which constitutes the rationale for workmen's compensation, that being that the human cost of the manufacture of a product in terms of disability to employees should be included in the financial cost of the product. All of these public policy objectives are served by the award in this case."

The board might also have noted his subsequent remarks: "Petitioner's argument is also defective in that it assumes that, if applicant had not been made deaf by his employment, he would not have engaged in other work activity subsequent to his retirement. That assumption is not borne out by the evidence of record. It is a pure speculation on petitioner's part. It is a matter of common knowledge that people frequently work at other employments after retiring from their first employment and often do so at a rate of pay in excess of that earned in the employment from which they retired. Applicant may well have done so if his employment had not caused him to become deaf."

If a person because of indolence, adequate pension earned by longevity, or because of an inheritance, gift or other windfall chooses not to work, although he might do so in spite of a permanent partially disabling condition, he does not forfeit the right to disability benefits which arises because of injuries incurred in the course of or arising out of his employment. No more does he do so because he does not discover his condition was so incurred until some period after the voluntary termination of his employment.

The decision and award of the Workmen's Compensation Appeals Board

is annulled and the case is remanded to that board for further proceedings consistent with the views expressed herein.

Elkington, J., and Bray, J.,* concurred.

The petition of respondent Bethlehem Steel Corporation for a hearing by the Supreme Court was denied April 4, 1974.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.