Filed 5/21/21  Town of Los Gatos v. Workers' Comp. Appeals Board CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| TOWN OF LOS GATOS et al., <br><br> Petitioner, <br><br> v. <br><br> WORKERS' COMPENSATION APPEALS BOARD and CHARLES HART, <br><br> Respondents. | H048333 <br> (W.C.A.B. No. ADJ9478055) |

The Town of Los Gatos (Town), permissibly self-insured, petitioned this court for a writ of review of a Workers' Compensation Appeals Board (WCAB) order amending and affirming the award of a workers' compensation judge (WCJ) who found respondent injured worker, Charles Hart, 100 percent permanently disabled.  The award included: (1) temporary disability (TD), (2) permanent total disability, (3) cost of living adjustments (COLA) on the permanent total disability payments (Lab. Code,[1] § 4659, subd. (c)), and (4) attorney fees.  Town does not challenge the WCAB's awards of TD, permanent total disability, or attorney fees.  Its petition for review is limited to the WCAB's order regarding the start date for the COLA's on the permanent total disability award.

---

[1] Undesignated statutory references are to the Labor Code.

Section 4659 provides for COLA's on permanent total disability benefits every January 1 starting the January 1 after the injured worker "becomes entitled to receive . . . total permanent disability indemnity." (§ 4659, subd. (c).)  Town challenges the WCAB's finding that the COLA's commenced on January 1, 2012.  It contends that the WCAB should have ordered the COLA's to start on January 1, 2017, since Hart was not declared permanent and stationary until November 2016 and since the WCAB ordered it to pay TD for the period August 11, 2011, through November 16, 2016.  It also contends that the WCAB's order regarding the start date for the COLA's is contrary to the California Supreme Court's holding in *Baker v. Workers' Comp. Appeals Bd.* (2011) 52 Cal.4th 434, 437 (*Baker*).  We granted Town's petition for writ of review.  Having reviewed the parties' arguments and the entire record, we agree with Town and will hold that the WCAB's order regarding the start date for the section 4659 COLA's is clearly erroneous.  We therefore annul the WCAB's order as to the start date for the COLA's and remand for further proceedings.[2]

---

[2] After we granted review, we received a letter brief from the WCAB that stated that upon preparing the record, it discovered "a significant error" in the WCAB's decision after reconsideration.  According to the letter brief, the WCAB failed to consider the WCJ's January 5, 2018 findings of fact and opinion on decision—which was issued after the second trial in this case and was not challenged below—when it issued its decision on reconsideration after the third trial.  The WCAB stated that since the WCJ's 2018 decision is law of the case, it was error for the WCAB not to consider it when ruling on Town's petition for reconsideration, and asked this court to annul the decision to allow it to correct that error.  The WCAB's letter brief did not explain how the error impacts the issue presented in Town's petition for writ of review, namely the proper start date for the COLA's.

Town filed a reply, which stated:  "[I]t is not clear that this is the same error or issue that led this Court to grant a Writ of Review.  The WCAB has provided no explanation of how this error affects the Decision, specifically as to the issue before the Court on [review]."  Town opposed the WCAB's request and asked the court to address the issue for which review was granted.  Since we annul the WCAB's decision, our disposition is consistent with the relief requested by the WCAB.

2

# I. FACTS AND PROCEDURAL HISTORY

## A. *Injury Facts*, *Temporary Disability*, *and Medical Treatment*

Hart started working for Town as an engineering inspector in July 2000. His duties included reviewing construction plans for compliance with building codes, approving plans, and inspecting construction sites to determine whether the work was code compliant.

On August 19, 2003, while inspecting a construction site, Hart slipped, fell onto a pile of rebar, and injured his lower back. Hart reported the injury to his employer and Town accepted liability for the claim. Hart was off work for eight days—from August 20 until August 27, 2003—and returned to work on full duty. Hart was off work again for 30 days in 2004—from July 10 until August 8, 2004—and returned to work on full duty. Hart continued to work for Town until he retired on December 11, 2009, at age 68.

Hart testified that he did not intend to retire in 2009 but when he completed the project he was working on, Town suggested that it was a good time for him to retire, and he therefore retired at his employer's request. He testified that he was unable to do his job because of his industrial injury and there was no other reason to retire. No physician took him off work in 2009 or certified him for a disability retirement, and he did not receive a disability retirement. He did not work for wages after he retired but did do volunteer work at a golf course four to six hours a week and at a senior center snack bar two hours a week.

Hart received continuous medical treatment for his industrial injury from the date of injury in 2003 through the last day of trial in 2019. The initial diagnosis was degenerative lumbar disc disease with facet arthritis. Magnetic resonance imaging (MRI) done in February 2004 revealed a disc protrusion at L4-L5, with mild stenosis of the central canal. In 2004, Hart started to complain of numbness and pain radiating into his left leg and later both legs. Hart initially treated with an orthopedist and then a neurologist, both of whom provided conservative treatment consisting of physical

3

therapy, hydrotherapy, exercise, a gym membership, a lumbar corset, a heating pad, and pain medications, including opiates. In 2009, he transferred his care to pain specialist Dr. Ronald Fujimoto and in 2010, he completed a spine rehabilitation program.

At trial, Hart testified that although he continued to perform his full, regular duties, he had ongoing, progressive symptoms in his lower back. He said his medical treatment between his date of injury in 2003 and his retirement in 2009 included "heavy opiate medications," which controlled his pain and allowed him to continue working.

In 2011, Town arranged for Hart to be examined by a qualified medical examiner in orthopedics, Dr. Eugene Baciocco. (Hart was not represented by counsel at that time.) Dr. Baciocco reported that Hart had a "fairly large herniated disc at L4-5 on the right side producing pain radiating down his right leg." He declared Hart's condition permanent and stationary as of January 10, 2011, and opined that Hart had sustained a permanent disability (PD) to his spine described as a 19-percent whole person impairment (WPI), which was "fairly severe in nature." Dr. Baciocco recommended continuing conservative treatment but stated that Hart might require surgery if his symptoms persisted or became more severe.

The concept of WPI is based on the American Medical Association Guides to the Evaluation of Permanent Impairment, 5th edition (hereafter Guides). (*Milpitas Unified School Dist. v. Workers' Comp. Appeals Bd.* (2010) 187 Cal.App.4th 808, 812, 814 (*Guzman*).) The Guides define WPI as " '[p]ercentages that estimate the impact on the individual's overall ability to perform activities of daily living, excluding work.' " (*Id.* at p. 814, fn. 5, citing Guides, p. 603.) In April 2004, the Legislature mandated the use of the Guides to rate PD as part of a major overhaul of the workers' compensation system with the enactment of Senate Bill No. 899 (Senate Bill 899). (Stats. 2004, ch. 34, § 32, eff. Apr. 19, 2004; § 4660, subd. (b)(1).)

The changes mandated by Senate Bill 899 included the amendment of section 4660, which "prescribes the method for determining the percentages of

4

permanent disability for workers' compensation purposes" (*Chang v. Workers' Comp. Appeals Bd.* (2007) 153 Cal.App.4th 750, 753) for injuries occurring before January 1, 2013. (Stats. 2004, ch. 34, § 32; § 4660.) Section 4660, subdivision (a) provides that "[i]n determining the percentages of permanent disability, account shall be taken of" four factors, including: (1) "the nature of the physical injury or disfigurement," (2) "the occupation of the injured employee," and (3) "his or her age at the time of the injury," with (4) "consideration being given to an employee's diminished future earning capacity."

As amended in 2004, section 4660, subdivision (b)(1) provides that "the 'nature of the physical injury or disfigurement' " used to determine the percentage of PD "shall incorporate the descriptions and measurements of physical impairments and the corresponding percentages of impairments published in the [Guides]." The amendment also directed the administrative director of the Division of Workers' Compensation of the Department of Industrial Relations (Administrative Director) to promulgate a new permanent disability rating schedule based in part on the Guides for dates of injury on or after January 1, 2005. (§ 4660, subds. (c), (d); Stats. 2004, ch. 34, § 32.) As so directed, the Administrative Director published a new permanent disability rating schedule effective January 1, 2005, which incorporated the Guides in their entirety. (*Guzman*, *supra*, 187 Cal.App.4th at p. 818; see also Dept. of Industrial Relations, Div. of Workers' Comp., Schedule for Rating Permanent Disabilities (January 2005) p. 1-2, hereafter 2005 Schedule.) Section 4660 also provided that the 2005 Schedule applies retroactively to some injuries that occurred before January 1, 2005. (§ 4660, subd. (d).)

A few months after he saw Dr. Baciocco, Hart sought treatment for his industrial injury from neurosurgeon Dr. Jason Lifshutz. Later in 2011, Dr. Lifshutz did surgery on Hart's lower back, which included a two-level spinal fusion and laminectomy at L4-L5

and L5-S1.[3]  Although the surgery initially provided relief, Hart's symptoms eventually worsened, and Dr. Lifshutz referred him to Dr. William Hopkins for pain management.

Dr. Lifshutz did a second surgery in May 2013, which included an interbody fusion at L4 through S1 and a decompression laminectomy at L3 through L5.  This effectively extended Hart's spinal fusion to include L3-L4.  Hart initially improved after his second surgery.  But his condition deteriorated, and he progressively increased his use of opioids to control his pain.  In January 2014, Dr. Hopkins took over his care and diagnosed failed back surgery syndrome.  In May 2014, Hart obtained legal counsel.

In early 2015, Hart was hospitalized for 24 days for "intractable low back pain."  One purpose of the hospital stay was to determine whether Hart might benefit from the use of an intrathecal pump to dispense pain medication directly to his spinal column.  Toward the end of his hospital stay, on March 7, 2015, Dr. Hopkins performed surgery to install the intrathecal pump.

Hart saw Dr. Lifshutz in consultation in 2015 and 2016 regarding further surgical intervention.  Both times, Dr. Lifshutz determined that Hart was not a good candidate for additional surgery.  Hart's lumbar fusion affected the curvature of his spine; he developed a significant kyphosis at the junction of T12 and L1, which caused him to stoop over and affected his gait.  Dr. Hopkins recommended Hart use a cane or a walker due to gait disturbance and balance problems from his back injury and surgeries.

The parties selected Dr. Stephen Conrad as an agreed medical examiner (AME) in orthopedics.  When Dr. Conrad examined Hart in November 2016, Hart complained of continuous low back pain radiating to both legs.  Hart could not stand erect; he used a

---

[3] The date of Hart's first surgery is not clear.  The record does not contain a copy of the operative report or the hospital discharge summary.  Other medical reports state that the surgery was on October 18, 2011, or suggest some other date in October 2011.  In her summary of the medical records, one of the vocational experts reported that the date of the surgery was August 18, 2011.  As noted in footnote 5, *post*, the WCJ's findings and award and opinion on decision contain inconsistent statements or findings about the date of the first surgery.

cane or walker, relied on a grasping tool to avoid bending over, and slept in a hospital bed. His pain limited his ability to walk, lift, sit, and stand, as well as his spinal range of motion. Dr. Conrad diagnosed failed back surgery syndrome and chronic pain syndrome and reported that the intrathecal pump provided only partial pain relief. Dr. Conrad stated that Hart's condition was permanent and stationary as of November 16, 2016. He described Hart's permanent impairment as a 28 percent WPI for the spine under the Guides but opined that the relevant disability category did not fully capture Hart's functional losses. He concluded that Hart's gait disturbance merited an additional 50 percent WPI and said the two disabilities should be combined. Since there was no evidence of preexisting spinal conditions or pathology and given the mechanism of Hart's injury, Dr. Conrad concluded that there was no basis for apportionment. He opined that Hart was not able to return to his job with Town, was totally permanently disabled, was unable to work in any capacity, and was unable to function in the open labor market. He added that if the parties disputed his assessment, he would defer to a vocational rehabilitation expert.[4]

## B. *First Trial Date and WCJ's Order to Develop the Record*

The case went to trial before a WCJ on October 3, 2017. Since Hart's date of injury and the last day for which TD benefits had been paid were both before January 1, 2005, the WCJ held that Hart's PD was to be rated under the 1997 permanent disability rating schedule, which is not based on the Guides and relies on a different system to rate work-related impairments. (Cal. Dept. of Industrial Relations, Div. of Workers' Comp., Schedule for Rating Permanent Disabilities (April 1997) pp. 1-4 to 1-8, 2-1 to 2-19

---

[4] Dr. Conrad stated in a supplemental report that a vocational expert was "unnecessary in this extreme case" and that Hart will be unable to work for the foreseeable future. In deposition, he acknowledged that he is not a vocational expert, said he would defer to a vocational expert on the question of Hart's ability to compete in an open labor market, and reiterated his view that a vocational expert was not needed in this "extreme case."

7

(hereafter 1997 Schedule); cf. § 4660 and former § 4660.)  The WCJ noted that Dr. Conrad's report provided only a Guides rating and did not include an " 'old schedule' rating."  On his own motion, and over Hart's objection, the WCJ reopened discovery to obtain a supplemental report from Dr. Conrad to address these questions:  (1) Could Dr. Conrad provide an " 'old schedule' rating" without reevaluating Hart? (2) If so, what is the rating? and (3) Does that rating change Dr. Conrad's opinion regarding Hart's PD? The WCJ therefore continued the trial to November 7, 2017.

Dr. Conrad provided a supplemental report dated October 24, 2017, that attempted to describe Hart's subjective complaints and work restrictions under the 1997 Schedule. He opined that Hart was limited to sedentary work with the aid of a four-pronged cane and was unable to function in the open labor market but stated again that he would defer to a vocational expert on the latter point.

### C. Second Day of Trial; WCJ's Findings and Award and Opinion on Decision

At the continued trial on November 7, 2017, the WCJ held a hearing.  Hart testified and the parties submitted documentary evidence.  The WCJ admitted Dr. Baciocco's reports for the limited "purpose of addressing medical diagnoses at given times" and ruled that they were not admissible on "the issues of permanent disability."

In his findings of fact and award filed on January 5, 2018, the WCJ found that Hart's PD was to be rated under the 1997 Schedule.[5]  He found that Dr. Conrad's AME report was "incomplete and stale as to [its] description of [Hart's] subjective and objective factors of permanent disability" under the 1997 Schedule.  In his opinion on decision, the WCJ noted that Hart had testified that his condition worsened after Dr. Conrad examined him and that Dr. Conrad failed to consider whether Hart's use of a cane or walker was a factor of disability.  The WCJ therefore found that Dr. Conrad's report was "incomplete and unclear and requires further development."  The WCJ

---

[5] Neither party petitioned the WCAB for reconsideration of that finding and it is not contested in this proceeding.

8

ordered discovery reopened "for the limited purpose of conducting a re-evaluation with AME Conrad," ordered the parties to appear for a status conference to discuss their requests to develop the record in other ways, and made other findings that are not at issue in this proceeding.

### D. Further Development of Record

Dr. Conrad reevaluated Hart in March 2018 and reported that his symptoms had worsened since November 2016. Hart reported an increase in pain, was dependent on both a walker and a cane, had given up his volunteer work at the golf course, but still volunteered at the senior center. Dr. Conrad described Hart's factors of disability and opined that he was totally disabled from an orthopedic perspective. He said Hart was unable to perform either part-time or full-time work, even on a sedentary basis; that his use of an intrathecal pump precluded gainful employment; and that he was unable to compete in the open labor market.

Both Hart and Town retained vocational rehabilitation experts. Hart's expert opined that Hart was unable to obtain and sustainably retain competitive gainful employment and that he was not amenable to vocational rehabilitation services. Town's expert agreed that Hart was not amenable to vocational rehabilitation services. But she opined that his absence from the labor market was based on his voluntary retirement at age 68, which is the average retirement age for men with his level of education. She noted that when Hart retired, he had no work restrictions, did not attempt to find less strenuous work, and never made a request for a reasonable accommodation from Town or any other employer.

### E. Third Day of Trial; WCJ's Findings and Award and Opinion on Decision

The parties appeared for a third day of trial on December 17, 2019. After hearing argument, the WCJ awarded Hart TD benefits from the date of his first back surgery

(which the WCJ found was August 11, 2011[6]) through the date that Dr. Conrad declared him permanent and stationary (which the WCJ found was November 16, 2018[7]) at the rate of $847.07 per week. The WCJ explained that he did not award TD for the period between Hart's December 2009 retirement date and the date of his first surgery because (1) no doctor ever took him off work or assigned any formal work restrictions; (2) prior to the surgery, Dr. Baciocco said he could perform his work duties; and (3) there was no evidence Hart sought full-time or part-time work after he retired. He found Hart's testimony that he was not planning to retire in 2009, that he retired at Town's request, and that he would have continued to work longer absent the pain from his industrial injury credible and unrebutted by Town. The WCJ found that Hart's "retirement was not entirely voluntary" and that he did "not remove himself from the labor market."

In his analysis of Hart's entitlement to TD benefits, the WCJ noted that "[Dr.] Baciocco [had] found [Hart] to be at MMI [(maximum medical improvement)] status as of May of 2011 with no entitlement to [TD] benefits." The WCJ found that by undergoing spinal surgery later that year, Hart's MMI status had changed, and he was no longer at MMI. The WCJ rejected Hart's contention that TD should start at least six months before his surgery date to cover the time that the surgeon did diagnostic testing and obtained authority to proceed with the surgery, since Hart did not submit any medical evidence that supported that contention.

---

[6] While the WCJ ordered temporary disability to commence on the date of Hart's first back surgery, his findings and award and opinion on decision contain inconsistent statements about when that happened. The findings and award ordered Town to pay TD starting on August 11, 2011. The statement of facts in the opinion on decision says the first surgery was on October 18, 2011. But in the discussion portion of the opinion on decision, the WCJ stated that the date of his first spinal surgery was August 18, 2011. Since all three dates are in 2011, these discrepancies do not affect our analysis of the commencement date for the COLA. See footnote 2, *ante*.

[7] The WCJ later acknowledged that the award contained an error and that Dr. Conrad had declared Hart permanent and stationary on November 16, 2016.

Based on Dr. Conrad's and the vocational experts' reports, the WCJ found the injury caused 100 percent PD and awarded Hart total PD payments of $602 per week for life, less credits for any PD advances paid and amounts payable as attorney fees. In his opinion on decision, the WCJ stated that PD was due "retroactive to the date of the last payment of temporary total disability . . . and to cover all periods thereafter but the period of [TD] awarded above."

Since he was injured after January 1, 2003 and was awarded 100 percent PD, the WCJ found that Hart was entitled to annual COLA's[8] on his total PD benefits pursuant to section 4659, subdivision (c). Citing *Duncan v. Workers' Comp. Appeals Bd.* (2009) 179 Cal.App.4th 1009 (*Duncan*), overruled in *Baker*, *supra*, 52 Cal.4th at page 437, the WCJ also found that since Dr. Baciocco declared Hart permanent and stationary in May 2011, his first COLA was due on January 1, 2012 and every January 1 thereafter. The WCJ also awarded Hart attorney fees. The WCJ did not award specific dollar amounts in back TD and PD benefits due. Instead, he directed the parties to "informally adjust [Hart's] retroactive and prospective" TD and PD "rate" subject to the attorney fees awarded, reserved jurisdiction over the award, and scheduled a status conference for 30 days to review the parties' efforts.

### F. Town's Petition for Reconsideration

Town petitioned for reconsideration. As relevant here, it argued that the WCJ erred in ordering the COLA to start on January 1, 2012 (the January 1st after Dr. Baciocco declared Hart permanent and stationary) and that the correct start date for the COLA was January 1, 2017 (the January 1st after Hart's TD benefits ended and he became entitled to receive total PD benefits). Town pointed out that *Duncan* was

---

[8] The record and the briefs also refer to the COLA as the "SAWW" adjustment. "SAWW" is the abbreviation for "state average weekly wage." Section 4659, subdivision (c) provides that the COLA shall be "an amount equal to the percentage increase in the 'state average weekly wage' as compared to the prior year" and defines how the SAWW is determined.

11

overruled in *Baker*, *supra*, 52 Cal.4th at page 437, eight years *before* the WCJ made the award here, and that the WCJ's award of COLA's during the time that Hart was receiving TD contradicted the holding in *Baker*. Town argued that there was an error in the end date for the TD award, since Hart was declared permanent and stationary on November 16, 2016, not November 16, 2018.[9]

### G. *WCJ's Report and Recommendation on Reconsideration*

The WCJ recommended granting reconsideration for the limited purpose of correcting a typographical error in his findings and award regarding the end date for the TD award. The WCJ did not acknowledge that *Duncan* had been overruled or otherwise respond to Town's argument about *Baker*. Instead, the WCJ discussed two WCAB decisions. Citing *Brower v. David Jones Construction* (2014) 79 Cal.Comp.Cases 550 (*Brower*)—an en banc decision of the WCAB—the WCJ stated that the only logical conclusion from *Brower* is that all permanent partial disability (sometimes PPD) benefits paid after the termination of TD are to be converted to permanent total disability (sometimes PTD) benefits regardless of when the injured worker is found to be totally disabled.[10]

The WCJ also cited *Vertis Communications v. Workers' Comp. Appeals Bd.* (2019) 84 Cal.Comp.Cases 427 (*Garietz*)—a WCAB panel decision in which writ review was denied—for the proposition that when an injured worker is entitled to PTD, such benefits begin that day after TD ends "even if there was no evidence at that time of PTD status." When applying *Garietz* to this case, the WCJ referred in error to the facts in a different case that involved a female worker who had sustained two separate industrial injuries. The WCJ rejected the "defendant's" argument that there was no legal obligation

---

[9] Town also challenged the WCJ's finding of 100 percent PD, but has not renewed that challenge in its petition to this court.

[10] PPD is paid when the PD rates between 0.25 and 99.75 percent at a much lower weekly rate ($185 to $230 in this case) than PTD, which is paid at the injured worker's initial TD rate ($602 in this case). (§ 4453, subds. (a)(8), (b).)

12

to convert all PPD benefits paid to PTD benefits while the injured worker is still working, stating that PPD benefits are paid regardless of work status. Based on *Brower* and *Garietz,* the WCJ made a new "formal finding" in his report on reconsideration that all PPD paid after August 9, 2004, be converted to PTD benefits[11] and reiterated his holding that the COLA's commenced on January 1, 2012. The WCJ did not recommend the WCAB amend the award to incorporate this finding.

### H. WCAB Order on Reconsideration

The WCAB granted reconsideration, adopted the WCJ's report and recommendation, amended the findings of fact and the award to reflect that TD was due through November 16, 2016 and not November 16, 2018, and affirmed the award as amended. The amendments to the award did not mention the WCJ's "formal finding" that all PPD paid after August 9, 2004, be converted to PTD.

## II. DISCUSSION

### A. Parties' Contentions

Town contends the WCAB erred by finding that the COLA commenced on January 1, 2012, since Hart was not permanent and stationary until November 16, 2016. Town argues that since Hart was still TD in 2012 and was not entitled to receive PTD benefits until November 16, 2016, the WCAB should have ordered the COLA to commence on January 1, 2017, and that the WCAB's order is contrary to section 4659, subdivision (c) and the Supreme Court's holding in *Baker*. Hart argues that there was no error and that the correct start date for the COLA's was January 1, 2012.

---

[11] While Town's petition to this court mentions this finding, it does not expressly challenge this finding as a question presented with reasoned argument or citation to authority. Since the WCJ ordered the parties to informally adjust retroactive benefits due among themselves and reserved jurisdiction over the issue and Town filed its petition for writ review before further proceedings could be held on that issue, it appears that the issue of any retroactive periods for which PTD may be owed has not yet been fully adjudicated before the WCAB and is therefore not properly before us in this proceeding.

13

**B. Standard of Review**

This court is authorized to review WCAB decisions and to issue a writ of review but may not exercise "its independent judgment on the evidence." (§§ 5952, 5950.) The WCAB's findings on questions of fact "are conclusive and final so long as, based on the entire record, they are supported by substantial evidence." (*Save Mart Stores v. Workers' Comp. Appeals Bd.* (1992) 3 Cal.App.4th 720, 723.) "This court must determine whether the evidence, when viewed in light of the entire record, supports the award of the WCAB. This court may not reweigh the evidence or decide disputed questions of fact. [Citations.] However, this court is not bound to accept the WCAB's factual findings if determined to be unreasonable, illogical, improbable or inequitable when viewed in light of the overall statutory scheme." (*Western Growers Ins. Co. v. Workers' Comp. Appeals Bd.* (1993) 16 Cal.App.4th 227, 233 (*Western Growers*).)

The WCAB's conclusions on questions of law are reviewed de novo and when the reviewing court is asked to interpret and apply a statute to undisputed facts, the review is also de novo. (*Benson v. Workers' Comp. Appeals Bd.* (2009) 170 Cal.App.4th 1535, 1543.) Unless clearly erroneous, the WCAB's interpretation of workers' compensation laws is entitled to great weight. Nevertheless, the court " 'need not defer to the [WCAB's] legal determinations where they are contrary to the plain meaning of the statute or prevailing case law.' [Citation.] When the statutory language is clear and unambiguous, there is no room for the [WCAB's] interpretation." (*Dept. of Corrections & Rehabilitation v. Workers' Comp. Appeals Bd.* (2018) 27 Cal.App.5th 607, 617.)

**C. The WCAB's decision regarding the start date for the section 4659 COLA's was clearly erroneous**

Section 4659, subdivision (c) (hereafter section 4659(c)) provides: "For injuries occurring on or after January 1, 2003, an employee who becomes entitled to receive a life pension or total permanent disability indemnity . . . shall have that payment increased annually commencing on January 1, 2004, and each January 1 thereafter, by an amount

14

equal to the percentage increase in the 'state average weekly wage' as compared to the prior year." Section 4659(c) also defines how the "state average weekly wage" is calculated for the purpose of that section. As the Supreme Court explained, section 4659(c) "provides for the annual indexing of two categories of workers' compensation benefits—total permanent disability and life pension payments—to yearly increases in the state's average weekly wage . . . , so that lifetime disability payments made to the most seriously injured workers will keep pace with inflation. The indexing procedure is sometimes referred to as an 'escalator,' or one providing for 'cost of living adjustments' (COLA's)." (*Baker*, *supra*, 52 Cal.4th at p. 437.)

The employee in *Baker* was injured in January 2004, suffered PTD, and became permanent and stationary in October 2006. (*Baker*, *supra*, 52 Cal.4th at p. 439.) A dispute arose as to when the COLA's commenced in his case. The Supreme Court considered three possible interpretations of section 4659(c), namely whether the statute requires the COLA's to be calculated: (1) "prospectively from the January 1 following the year in which the worker first becomes 'entitled to receive a life pension or total permanent disability indemnity' . . . , i.e., when the payments actually commence," which the court concluded was January 1, 2007, in the employee's case since his condition became permanent and stationary in October 2006; (2) "retroactively to the January 1 following the year in which the worker sustains the industrial injury," which was January 1, 2005, in the employee's case since he was injured in 2004; or (3) retroactively to January 1, 2004, in every case with a qualifying industrial injury, "regardless of the date of injury or the date the first benefit payment becomes due," which was the interpretation the court of appeal adopted in *Duncan*, *supra*, 179 Cal.App.4th 1009. (*Baker*, *supra*, 52 Cal.4th at p. 438.)

Based on the plain language of section 4659(c), the Supreme Court selected the first interpretation. The court held that to "receive the benefit of a COLA on any given January 1, a worker who has sustained an industrial injury must meet two conditions.

15

First, he or she must have been injured 'on or after January 1, 2003 . . . .' " (*Baker*, *supra*, 52 Cal.4th at p. 443, quoting § 4659(c).)  Hart meets that condition since he was injured on August 19, 2003.  Second, the injured worker "must '*become*[] *entitled* to receive a life pension or total permanent disability indemnity . . .' " (*Baker*, at p. 443.) Injured workers whose PD rates range from 70 percent to 99.75 percent are entitled to life pension benefits in addition to partial permanent partial disability payments.  (§ 4659, subd. (a).)  Partial permanent disability indemnity is paid biweekly over a period of years and months, the length of which depends on the percentage of PD.  The life pension payments start *after* all the partial permanent disability payments have been made.  Thus, an injured worker's entitlement to life pension "payments arises, by statute, when the worker's partial permanent disability benefits have been exhausted." (*Baker*, at p. 443, citing § 4659, subd. (a).)

As for total permanent disability payments, the *Baker* court explained that, based on its prior holdings, "the entitlement to total permanent disability indemnity payments arises when the injured worker's condition becomes permanent and stationary or, to put it in other terms, when the statutory obligation to pay temporary disability indemnity has ceased." (*Baker*, *supra*, 52 Cal.4th at p. 443, citing *LeBoeuf v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 234, 238, fn. 2 & *Department of Rehabilitation v. Workers' Comp. Appeals Bd.* (2003) 30 Cal.4th 1281, 1292 (*Lauher*).)  Hence, under section 4659(c)'s "express language, it is not until the injured employee '*becomes entitled to receive* a life pension or total permanent disability indemnity' . . . , and actually begins receiving such payments, that he or she 'shall have *that payment* increased annually' " by the COLA. (*Baker*, at p. 443.)  Thus, the court concluded that the COLA's are to be calculated and applied prospectively commencing on the January 1 following the date on which the injured worker first became entitled to receive total permanent disability or life pension benefits.

16

Town argues that the WCAB erred by failing to follow binding Supreme Court precedent in *Baker*. We agree. Indeed, as noted, rather than cite *Baker* in his opinion on decision in 2020, the WCJ relied on *Duncan*, *supra*, 179 Cal.App.4th 1009, which was superseded by a grant of review in 2010 and overruled in *Baker* in 2011. Even after that error was briefed by Town in its petition for reconsideration, the WCJ (and the WCAB) continued to ignore *Baker*.

Under *Baker*, Hart was not entitled to have his PTD payments adjusted by the COLA until the January 1 after he became entitled to receive PTD benefits and actually began receiving such payments. (*Baker*, *supra*, 52 Cal.4th at p. 443.) Since Hart was awarded PTD and not a life pension, the date of such entitlement is when his condition became "permanent and stationary, or to put it in other terms, when the statutory obligation to pay temporary disability indemnity [had] ceased." (*Ibid.*) Hart's condition was permanent and stationary on November 16, 2016. In addition, the WCJ ordered Town to pay back TD for the period August 11, 2011 through November 16, 2016. Thus, Town's obligation to pay temporary disability indemnity also ceased on November 16, 2016. Under *Baker*, his COLA's commenced on January 1, 2017 and the WCAB erred in ordering that the COLA's start on January 1, 2012.

Additionally, under section 4659 and *Baker*, the COLA's begin the January 1 after the injured worker becomes entitled to receive and actually receives *PTD benefits*. The WCJ ordered the COLA to begin on January 1, 2012. But he also ordered Town to pay TD benefits from August 11, 2011, until November 16, 2016. Thus, pursuant to the WCJ's own order, when the COLA commenced, Hart was *still TD* and was not yet entitled to receive PTD benefits. TD and PD benefits serve very different purposes and do not cover the same time periods. "[T]he obligation to pay [TD] ends when the injured employee either returns to work [citations] or is deemed able to return to work [citation], or when the employee's medical condition achieves permanent and stationary status [citation]." (*Lauher*, *supra*, 30 Cal.4th at p. 1292.) " 'An injured employee cannot be

17

temporarily and permanently disabled at the same time; thus, permanent disability payments do not begin until temporary disability payments cease.' " (*Ibid*., quoting *City of Martinez v. Workers' Comp. Appeals Bd.* (2000) 85 Cal.App.4th 601, 609.)

As Town notes, the confusion in this case appears to result from the fact that unlike the injured worker in *Baker*—whose condition was declared permanent and stationary only once—Hart's condition was declared permanent and stationary on two separate occasions. In June 2011, Dr. Baciocco reported that his condition was permanent and stationary as of January 10, 2011, and Dr. Conrad declared his condition permanent and stationary as of November 16, 2016. Town argues that the WCAB usurped its power when it based the start date for the COLA on the 2011 permanent and stationary date in Dr. Baciocco's report and not the 2016 permanent and stationary date in Dr. Conrad's (the AME's) report.

In his findings of fact, the WCJ did not make an express finding as to when Hart's back injury became permanent and stationary. As noted, in his analysis of Hart's entitlement to TD benefits in his opinion on decision, the WCJ stated that "[Dr.] Baciocco [had] found [Hart] to be at MMI status as of May of 2011."[12] Quoting California Code of Regulations, title 8, section 9785, subdivision (a)(8), the WCJ explained that the workers' compensation regulations define "permanent and stationary status" as " 'the point when the employee has reached maximum medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment.' " The WCJ found that by undergoing spinal surgery a few months after he saw Dr. Baciocco, Hart's MMI status had changed, and he was no longer at MMI. Moreover, the WCJ made an implied finding that Hart was no longer permanent and stationary as of August 11, 2011—less than three months

_____

[12] The date reference appears to be to the date Dr. Baciocco examined Hart (May 19, 2011), not the date that Dr. Baciocco found him permanent and stationary (January 10, 2011).

18

after he saw Dr. Baciocco—when he ordered Town to pay TD from August 11, 2011, until he was declared permanent and stationary by Dr. Conrad on November 16, 2016. In addition, the WCJ admitted Dr. Baciocco's reports for the limited "purpose of addressing medical diagnoses at given times" and ruled that they were "not admissible relative to the issues of permanent disability."

In summary, in his opinion on decision and award of TD and PD benefits, the WCJ limited and discounted Dr. Baciocco's opinion as to the date Hart became permanent and stationary. But when discussing the COLA on the PTD award, the WCJ relied on the date of Dr. Baciocco's examination, rather than the opinion of the AME regarding the date that Hart's condition became permanent and stationary. While under our standard of review we give great deference to the WCJ's findings of fact, based on our review of the entire record, we conclude that the WCJ's inconsistent treatment of the evidence regarding the date on which Hart's condition became permanent and stationary is both unreasonable and illogical. (*Western Growers*, *supra*, 16 Cal.App.4th at pp. 233-234.) We therefore hold that the WCJ's conclusion that the COLA commenced in 2012, based on the date of Dr. Baciocco's examination, is not supported by substantial evidence.

In addition, Hart's TD rate in 2003 was $602 per week, the maximum TD rate payable for injuries occurring in 2003. (§ 4653 [TD is paid at two thirds of the average weekly wage]; § 4453, subd. (a)(8) [maximum average weekly wage for TD benefits in 2003 was $903; two thirds of $903 is $602].) But since the TD ordered for the period beginning in 2011 was paid more than two years after the date of injury, it was subject to the statutory maximums in effect at the time the payment was made, rather than those in effect on the date of injury. (§ 4661.5.) The WCJ found that the amount due when the payment was made was $847.07 per week based on Hart's earnings. This increase in the TD rate over time was designed to reflect inflationary conditions to which the injured worker is entitled by statute. (*Hofmeister v. Workers' Comp. Appeals Bd.* (1984) 156

Cal.App.3d 848, 853.) Thus, both the increase in the TD rate from $602 to $847.07 per week (§ 4661.5) and the COLA on PTD payments (§ 4659(c)) were designed to account for inflation. In this case, the WCJ found that both the COLA and the increased TD rate were due during the same time period. But it is unlikely the Legislature intended that the injured worker benefit from double increases in benefits to account for the effects of inflation. The Supreme Court came to a similar conclusion in *Baker*. It stated: "It is unreasonable to infer that the Legislature intended *two* distinct anti-inflation measures to overlap and apply to the calculation of the same total permanent disability payment rate. Moreover, workers who sustain industrial injuries qualifying them for total permanent disability payments receive temporary disability payments which, depending on the date of injury, may themselves be indexed to the SAWW, thereby protecting the worker from the effects of inflation during the period of eligibility for temporary disability benefits." (*Baker*, *supra*, 52 Cal.4th at p. 446.) Since the TD payments ordered for the period August 11, 2011, to November 16, 2016, already accounted for inflation, it was unreasonable for the WCJ to also order that the COLA's, which are designed to account for inflation, begin while Hart was still receiving TD payments.

Rather than discuss *Baker*, the WCJ's report on reconsideration relied on *Brower*, *supra*, 79 Cal.Comp.Cases 550. In *Brower*, the WCAB, sitting en banc,[13] considered how the 2004 changes to the workers' compensation laws in Senate Bill 899 altered the timing of PD payments. (*Id.* at pp. 552, 557-562.) Prior to April 19, 2004, there was no limit on the amount of total TD benefits paid. After the passage of Senate Bill 899, TD benefits for workers who were injured on or after April 19, 2004, were limited by statute to 104

---

[13] "An en banc decision of the WCAB binds future WCAB panels and WCJ's as legal precedent in the same manner as a published appellate opinion." (*Signature Fruit Co. v. Workers' Comp. Appeals Bd.* (2006) 142 Cal.App.4th 790, 796, fn. 2, citing Cal. Code Regs., tit. 8, § 10341.) Such opinions are citable to the extent that they point out the contemporaneous interpretation and application of the workers' compensation laws by the WCAB. (*Ralphs Grocery Co. v. Workers' Comp. Appeals Bd.* (1995) 38 Cal.App.4th 820, 827, fn. 7 (*Ralphs Grocery*).)

weeks from the date TD benefits were first paid.  (§ 4656, subd. (c)(1); *Hawkins v. Amberwood Products* (2007) 72 Cal.Comp.Cases 807, 809-813 [WCAB en banc.])  Generally, the percentage of PD cannot be determined until the worker's condition is permanent and stationary.  In many cases with the cap on TD benefits, the injured worker's condition is not permanent and stationary when the statutory obligation to pay TD ends.  For example, the employee in *Brower* was injured in December 2005, but not permanent and stationary until October 2011, almost six years later.  Although he was medically TD from December 2005 until October 2011, the employer's statutory obligation to pay TD ended in December 2007 and the employee was not entitled to TD benefits after that date.  Thus, there was an almost four-year gap between his last TD payment and his permanent and stationary date.  (*Brower*, at pp. 551-552.)

In *Brower*, the WCAB held that when an employer stops paying TD pursuant to the 104-week cap in section 4656, subdivision (c) before the injured worker's condition is declared permanent and stationary, section 4650, subdivision (b) requires the employer to begin paying PD advances based on a reasonable estimate of the injured worker's ultimate level of PD.  This allows for an uninterrupted flow of benefits during the transition from TD to PD.  (*Brower*, *supr*a, 79 Cal.Comp.Cases at p. 560.)  In addition, the WCAB held that when an injured worker who received permanent *partial* disability payments during this transition period becomes permanent and stationary and is determined to be permanently *totally* disabled, the defendant shall pay PTD indemnity retroactive to the date the statutory obligation to pay TD ended.  (*Id*. at p. 561.)  The WCAB held that the section 4659 COLA's begin on the first day in January after the injured worker becomes entitled to receive permanent disability advances pursuant to section 4650, subdivision (b) regardless of the date the worker's condition became permanent and stationary.  The WCAB noted that although this is contrary to the general holding in *Baker*, the Supreme Court expressly excluded post-Senate Bill 899 injuries from its holding in *Baker*.  (*Brower*, at pp. 562-563, citing *Baker*, *supra*, 52 Cal.4th at

21

p. 439, fn. 2.) In *Baker*, the Supreme Court stated: "Our discussion of total permanent disability benefits pertains only to those payable for injuries occurring before April 19, 2004. For later injuries, it may be that an injured worker would become entitled to total permanent disability payments, and corresponding COLA's, before the worker's medical condition is permanent and stationary. [Citations.] We express no view on that question, which is not presented under the facts of [*Baker*]." (*Baker*, at p. 439, fn. 2.) The WCAB concluded in *Brower* that even though Brower's condition was not declared permanent and stationary until 2011, he was entitled to PTD benefits retroactive to the last day he received TD in December 2007 and since he became entitled to receive PTD in December 2007, he was entitled to a COLA starting on January 1, 2008.

The WCJ's reliance on *Brower* was misplaced for several reasons. First, Hart was injured in 2003, before the Legislature enacted Senate Bill 899 and made the statutory changes that were at issue in *Brower*. Second, the 104-week cap on TD benefits does not apply here, and unlike the injured worker in *Brower*, there was no gap between the last day that TD was due and the date that Hart's condition became permanent and stationary. Third, unlike the injured worker in *Brower*, who was disabled continuously from the date that he was injured and first TD until his condition was declared permanent and stationary, Hart's periods of disability were not continuous. His periods of TD were punctuated by returns to full work duty, a period of disability for a non-industrial condition, and his retirement. The WCJ found that no doctor took Hart off work or placed him on any formal work restrictions when he retired. Hart did not take a disability retirement, and no physician authorized TD between the date he retired in 2009 and the date of his first surgery in 2011.

Town also argues that the WCJ erred in relying on *Garietz*, *supra*, 84 Cal.Comp.Cases 427 and that *Garietz* was wrongly decided. *Garietz* is a writ denied, WCAB panel decision. WCAB panel decisions and denials of petitions for writ of review reported in the California Compensation Cases are properly citable authority, but

22

only to the extent that they point out the contemporaneous interpretation and application of the workers' compensation laws by the WCAB. They are of limited precedential value and unquestionably have no stare decisis effect in an appellate court. (*Ralphs Grocery*, *supra*, 38 Cal.App.4th at p. 827, fn. 7.) Like this case, *Garietz* involved an injury that occurred before April 19, 2004, and evidence that the injured worker was permanent and stationary on two separate dates (in 2006 for his orthopedic injuries, which resulted in PPD of less than 70 percent, and in 2015 for his psychiatric injuries, which resulted in PTD). The WCAB held that the worker was entitled to PTD retroactive to his first permanent and stationary date in 2006 and a COLA starting on January 1, 2007. But unlike this case, the WCAB in *Garietz* did not order further TD or a COLA during the time that the injured worker was receiving TD. The WCJ's reliance on *Garietz* was therefore misplaced.

In summary, the WCJ's decision relied on case law that had been overruled, and his report on reconsideration failed to consider binding Supreme Court precedent in *Baker* and instead cited WCAB decisions that did not apply or are factually distinguishable. His decision to base the commencement date for the COLA's on the date of Dr. Baciocco's examination was inconsistent with his treatment of that evidence on other issues, unreasonable, and therefore not supported by substantial evidence. More importantly, the WCJ erred under *Baker* when he ordered Town to begin paying COLA's on the PTD benefits while Hart was still receiving TD. For these reasons, we conclude that the WCAB's finding that the start date for the COLA's was January 1, 2012, was clearly erroneous. We shall therefore annul the WCAB's decision with regard to the commencement date on the COLA's and remand to the WCAB for further proceedings consistent with this opinion.

### D. *Hart's Request for Attorney Fees*

Hart requests a remand to the WCAB for an award of attorney fees for services rendered in connection with this writ proceeding on the ground that there was no

reasonable basis for Town's petition. Section 5801 provides: "*In the event the injured employee . . . prevails* in any petition by the employer for a writ of review from an award of the appeals board and the reviewing court finds that there is no reasonable basis for the petition, it shall remand the cause to the appeals board for the purpose of making a supplemental award" of attorney fees "for services rendered in connection with the petition." (Italics added.) Since we granted review, annul the WCAB's award as to the COLA's, and remand to the WCAB, Hart has not prevailed in these proceedings and therefore is not entitled to a supplemental award of attorney fees.

### III. DISPOSITION

The WCAB's decision after reconsideration is annulled regarding the start date for the COLA's, and the matter is remanded to the WCAB for further proceedings consistent with our opinion. Hart's request for an award of supplemental attorney fees is denied. Each party is to bear his or its own costs in this proceeding.

_____

Greenwood, P.J.

WE CONCUR:


_____

Grover, J.


_____

Danner, J.


Town of Los Gatos et al. v. Workers' Compensation Appeals Board
No. H048333